UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES CARLOCK,                                          CLASS ACTION

      On behalf of himself and all others
similarly situated,

          Plaintiff,

                              Case No. 24-11122

v.

CITY OF HARPER WOODS; GLEN HEANEY,
MATTHEW CLOSURDO, DANIEL MCCAW,
GEORGE SPARKS, JAMES RUTHENBERG,
and TED STAGER, in their individual capacities
as officers of the Harper Woods Police Department;
WAYNE COUNTY; 32A DISTRICT COURT,

          Defendants.
_____

SHEREEF H. AKEEL (P54345)
HASAN KAAKARLI (P81099)
DANIEL W. CERMAK (P84460)
HAYDEN PENDERGRASS (P86888)
Akeel & Valentine, PLC
Attorneys for Plaintiff
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084-4736
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
daniel@akeelvalentine.com
hayden@akeelvalentine.com
_____

## **CLASS ACTION COMPLAINT AND JURY DEMAND**

1

**NOW COMES** Plaintiff, JAMES CARLOCK, by and through his undersigned counsel, AKEEL & VALENTINE, PLC, and for his Class Action Complaint against the above-named Defendants, states as follows:

## <u>INTRODUCTION</u>

1.    Plaintiff James Carlock was unlawfully detained in jail for over two years, without probable cause, for the sole reason that he could not afford the secured cash bail conditions[1] imposed by the 32A District Court, before he was acquitted of all charges by a jury of his peers. The Harper Woods Defendants'[2] conduct deprived Mr. Carlock of his rights guaranteed to him under the U.S. Constitution, including the Fourth, Eighth, and Fourteenth Amendments—and constituted tortious conduct under Michigan law, including malicious prosecution and gross negligence. For his individual claims set forth below, Mr. Carlock seeks *inter alia* compensatory damages, punitive damages, and attorneys' fees and costs for the Harper Woods Defendants' conduct.

2.    For his class action claims set forth below, Mr. Carlock seeks *inter alia* injunctive and declaratory relief addressing the 32A District Court's policy and

---

[1] The term "secured cash bail conditions", here, means bail conditions that can only be satisfied by the arrestee paying money (or having money be paid by someone else) either directly to the government or to a bail bondsman, who provides surety for to the government.

[2] The term "Harper Woods Defendants" used herein refers collectively to Defendants City of Harper Woods ("Harper Woods"), Glen Heaney, Matthew Closurdo, Daniel McCaw, George Sparks, James Ruthenberg, and Ted Stager.

practice of imposing secured cash bail conditions without: (1) a hearing at which an arrestee's ability to pay is considered, as required by the Fourteenth Amendment; and (2) constitutionally required individualized findings that the arrestee is an unmanageable flight risk or an identifiable and articulable danger to the community and that such risks cannot be alleviated by alternate non-financial release conditions. Plaintiffs also seek a permanent injunction prohibiting the Wayne County Sheriff from holding new pretrial detainees in jail unless constitutionally adequate bail hearings have occurred.

3.      Indigent defendants in Wayne County, including in Harper Woods, are routinely jailed because they cannot afford bail. Meanwhile, similarly situated individuals who can afford bail are routinely released. This unnecessary, unconstitutional, and costly wealth-based discrimination against indigent people accused of crimes in Harper Woods is the result of the 32A District Court's policy and practice of making no inquiry whatsoever into an arrestee's ability to pay before imposing bail requirements. These impossible cash bail terms operate as *de facto* orders of pretrial detention, yet the 32A District Court sets them without any of the findings or procedures that the U.S. Constitution requires before a court is permitted to order a presumptively innocent person to be detained prior to trial.

4.      Arrestees who can afford to pay bail are routinely released from custody upon payment. Arrestees who are otherwise identical, but are too poor to purchase

their release, remain in jail because of their indigency. On any given night, hundreds of people arrested in Wayne County remain in custody in Wayne County jails before trial—and the vast majority are there only because they cannot afford to purchase their release. These individuals risk losing their jobs, homes, custody of their children, health care, and other life necessities as a result of this wealth-based detention.

5.      Mr. Carlock was detained without probable cause and remained in jail for over two years because he could not afford the bail set in his cases. He participated in a summary arraignment in the 32A District Court, at which he was never asked about his income, expenses, or ability to pay before setting his bail amount. For each day arrestees, like Mr. Carlock, remain in jail, such arrestees risk losing their jobs, their homes, their health, and their ability to support and take care of their children and other loved ones, among other harms.

6.      On behalf of the many other arrestees subjected to the 32A District Court's unlawful and ongoing pretrial detention scheme, supported by a custom of tolerance or acquiescence on behalf of Wayne County and Harper Woods. Mr. Carlock challenges the routine use of secured cash bail to disproportionately detain indigent individuals arrested in Harper Woods, which occurs without a hearing at which an arrestee's ability to pay is considered. This wealth-based pretrial detention

system violates the Equal Protection and Due Process Clauses of the U.S. Constitution, as courts around the country have held in analogous situations.

## JURISDICTION AND VENUE

7.     This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201 *et seq*., and the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution, as well as under state law. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1343 (civil rights jurisdiction), and 1367 (supplemental jurisdiction).

8.     This Court has personal jurisdiction over the named Defendants because they either reside in the state of Michigan and/or have systematic and continuous contacts with Michigan.

9.     Venue lies in the Eastern District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b), because the events that support Plaintiff's allegations occurred in this district and because the Defendants reside in this district.

## THE PARTIES

10.     Plaintiff James Carlock is a resident of Wayne County, Michigan. In addition to his individual claims, he brings this suit on behalf of himself as an individual and on behalf of a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme effectuated by Defendants Wayne County, City of Harper Woods, and 32A District Court. At the time of his

5

warrantless arrest, he could not afford to pay the cash bail imposed in his case, and he could not afford counsel.

Harper Woods Defendants

11.     Defendant City of Harper Woods ("Harper Woods") is a municipal corporation duly organized and existing by virtue of the laws of the State of Michigan, and its principal place of business is in Wayne County, Michigan. Harper Woods operates the Harper Woods Police Department ("HWPD") and employs its police officers, including the Defendants mentioned below. Harper Woods is also the "district funding unit" of Defendant 32A District Court mentioned below. Mich. Comp. Laws § 600.8104(b).

12.     Defendant Glean Heaney was employed by the HWPD as a Detective. Heaney and other officers investigated Mr. Carlock, leading to his imprisonment in jail without probable cause for over two years. Heaney was acting under color of state law during the period in question. Heaney is being sued in his individual capacity.

13.     Defendant Matthew Closurdo was employed by the HWPD as a Detective Sergeant. Closurdo and other officers helped investigate Mr. Carlock, leading to his imprisonment in jail without probable cause for over two years. Closurdo was acting under color of state law during the period in question. Closurdo is being sued in his individual capacity.

14.     Defendant Daniel McCaw was employed by HWPD as a Police Officer. McCaw and other officers helped investigate Mr. Carlock, leading to his imprisonment in jail without probable cause for over two years. McCaw was acting under color of state law during the period in question. McCaw is being sued in his individual capacity.

15.     Defendant James Ruthenberg was employed by HWPD as a Detective Sergeant. Ruthenberg and other officers helped investigate and arrest Mr. Carlock, leading to his imprisonment in jail without probable cause for over two years. Ruthenberg was acting under color of state law during the period in question. Ruthenberg is being sued in his individual capacity.

16.     Defendant Ted Stager was employed by HWPD as Deputy Chief. Stager and other officers helped investigate and arrest Mr. Carlock, leading to his imprisonment in jail without probable cause for over two years. Stager was acting under color of state law during the period in question. Stager is being sued in his individual capacity.

Wayne County

17.     Defendant Wayne County is a charter county duly organized and existing by virtue of the laws of the State of Michigan, and its principal place of business is in Wayne County, Michigan. Wayne County. Wayne County maintains

and operates the jails in Wayne County, where Mr. Carlock was held, and other arrestees are held, after arraignment by the 32A District Court.

18.    Rafael "Ray" Washington is the Sheriff of Wayne County. He is responsible for the operation and administration of the jails in Wayne County where Mr. Carlock was held, and other arrestees are held, after arraignment by the 32A District Court.

### 32A District Court

19.    Defendant 32A District Court is a third-class district court duly organized and existing by virtue of the laws of the State of Michigan. *See* Mich. Comp. Laws §§ 600.8103(3), 600.9937. Its principal place of business is in the City of Harper Woods, Wayne County, Michigan. The 32A District Court has jurisdiction over *inter alia* arraignments, the fixing of bail, the accepting of bonds, probable cause conferences, and preliminary examinations. *See* Mich. Comp. Laws § 600.8311.

20.    Rebekah Coleman is the sole and Chief Judge of the 32A District Court. As the sole judge of the 32A District Court, she is responsible for *inter alia* conducting the arraignments at which bail is initially set for individuals who are subject to the 32A District Court's jurisdiction and who are detained at the time of their arraignment, including Mr. Carlock. Her bail determinations set the conditions for detention in Wayne County jails pending arrestees' next court appearances. As

Chief Judge, she is responsible generally for the administration of the 32A District Court. She has full authority and control over the court's administration, subject only to the control of the Michigan Supreme Court.

## FACTUAL ALLEGATIONS

### A.   Mr. Carlock Was Held in Jail Without Probable Cause for Over Two Years Solely Because He Was Unable to Pay for His Release

21.     Early in the morning of July 12, 2021, Plaintiff James Carlock returned home from a family party to assist his then-girlfriend, Amanda Hampton, with whom Mr. Carlock had lived for the three previous years, at 18590 Elkhart Street, Harper Woods, Wayne County, Michigan. Hampton had a fractured right ankle at the time, and requested Mr. Carlock's assistance, stating she wanted to go to the hospital.

22.     Despite the soft cast on her right leg, Hampton drove in her rental car, accompanied by Mr. Carlock, and went to St. John's Hospital, arriving around 4:00 a.m. Hampton told Mr. Carlock to take the car and that she would contact him when she was ready to be picked up.

23.     Unbeknownst to Mr. Carlock, Hampton presented at the hospital with a second degree burn under her left arm. Hampton reported that she and Mr. Carlock had had a physical altercation and that he had attempted to set her on fire.[3]

---

[3] Notably, the hospital records reflect conflicting accounts of what accelerant Hampton reported was purportedly poured on her, with both gasoline and lighter fluid mentioned.

24.    Notably, the treating physicians noted that Hampton did not have any injuries to her face, despite Hampton reporting that she had been struck on the left cheek. The treating physicians also noted that Hampton had no other burns on her body.

25.    Defendant Officer Daniel McCaw was dispatched to the hospital to take a report.

26.    According to McCaw, Hampton gave the following statement: Hampton woke up around 1:00 a.m. and discovered that Mr. Carlock was gone with her keys, phone,[4] and rental car. Hampton was able to contact Mr. Carlock via a "google app",[5] and they began arguing about Hampton's alleged infidelity. Mr. Carlock arrived at the house around 3:00 a.m., where they proceeded to argue further. The argument became physical, and Mr. Carlock slapped her and threw her on the couch, went outside and retrieved a gas can, and poured gasoline on his hands and all over Hampton's body. Mr. Carlock threatened to burn her and shoot himself in the head and began sparking a lighter, until he set fire to Hampton's arm. Both Hampton and Mr. Carlock then put the fire out, and Hampton stated that she wanted

---

[4] Hampton later testified, at the preliminary examination, that she simply could not find her cell phone. According to Stager, only Mr. Carlock's cell phone was recovered during his arrest.

[5] Hampton later testified, at the preliminary examination hearing, that she contacted Mr. Carlock via Facebook.

to go the hospital. Hampton then drove them both to the hospital, and Mr. Carlock left with the car.

27.     Hampton reported never seeing a gun and that Mr. Carlock had never previously threatened to kill her or himself.

28.     Hampton told McCaw that Mr. Carlock could likely be located at his mother's house.

29.     McCaw noted that Hampton's burn was "minor".

30.     McCaw took photographs of Hampton's arm and collected Hampton's clothing, which McCaw reported were purportedly "soaked" in gasoline.[6] Defendant Deputy Chief Ted Stager was informed of the purported incident.

31.     Later that day, Defendants Detective Sergeant Closurdo and Detective Glen Heaney went to the hospital and reviewed the hospital security footage, which showed Hampton driving up to the hospital in her rental car, exiting the vehicle, and entering the hospital and Mr. Carlock then entering the driver's seat and driving away.

32.     Closurdo and Heaney also received Hampton's consent to search the house, garage, and any vehicles present on the premises.

---

[6] Notably, the pictures taken of Hampton's clothing by McCaw appear to show that the clothing was dry.

33.     At the house, Closurdo and Heaney located two small gasoline cans in the detached garage: one sitting on a shelf and the other sitting on the ground next to a lawn mower. Closurdo and Heaney took photographs of the garage and took the gas cans into evidence. Notably, neither Closurdo nor Heaney indicated how full or empty the gas cans were.

34.     Closurdo and Heaney then proceeded into the house and took additional photographs. Notably, none of these photographs show any residual gasoline on, or any fire or smoke damage to, any part of the house, including the couch or nearby furniture.

35.     Closurdo and Heaney did not report any odor from gasoline or smoke in the house and took no samples of any items for testing.

36.     Closurdo and Heaney did not canvass the neighborhood or speak to any potential witnesses.

37.     That same day, Stager and Defendant Detective Sergeant Ruthenberg called Mr. Carlock, who declined to come in for questioning.

38.     Ruthenberg then executed an exigent circumstances request[7] with Mr. Carlock's cell phone service provider and located Mr. Carlock using GPS pings from Mr. Carlock's cell phone.

---

[7] Notably, Ruthenberg never articulated what the exigent circumstances were in this case, other than a vague reference to Mr. Carlock purportedly "continu[ing] his

39.    Stager and Ruthenberg surveilled Mr. Carlock in Hampton's rental car at an apartment complex, accompanied by a female passenger.

40.    Stager and Ruthenberg executed a warrantless arrest and took Mr. Carlock into custody. At the time of the warrantless arrest, Mr. Carlock was wearing the same clothing on the night of the purported incident, as confirmed by the hospital surveillance footage.

41.    Stager recovered a wallet and a lighter from Mr. Carlock's person and recovered a plastic bag containing cannabis, Mr. Carlock's cell phone, a white t-shirt, and cell phone charging cords from the vehicle.

42.    Stager reported that Mr. Carlock and the vehicle purportedly smelled strongly of perfume.[8]

43.    Ruthenberg interviewed the female passenger, who advised that she had been dating Mr. Carlock for three months and that she was not aware of the purported incident with Hampton.

44.    At booking, Mr. Carlock's shorts, shirt, shoelaces, and headband were taken into evidence and turned over to Stager.

---

rampage" during a phone call. In addition to access to GPS pings, Ruthenberg also requested account information and the last 48 hours of call logs with cell tower data, all without a warrant.

[8] As explained in the expert report of arson expert Robert Trenkle, the perfume could not mask the odor of gasoline nor alter the results of gas chromatography-mass spectrometry testing by the Michigan State Police, which showed no trace of gasoline on any of Mr. Carlock's articles of clothing, as discussed below.

45.     During his time in custody, Mr. Carlock was repeatedly threatened that he would be pepper sprayed if he did not remove the glasses he was wearing. In response, Mr. Carlock wetted the only article of clothing left, his white tank top, in an effort to cover his face in the event he was pepper sprayed. The white tank top that Mr. Carlock had been wearing was later recovered from Mr. Carlock's jail cell and taken into evidence by Stager, who reported that the tank top was purportedly "wet to the touch and appeared to be intentionally watered down."[9]

46.     Mr. Carlock, who suffers from asthma and uses an emergency inhaler, had to be taken to the hospital while in custody.

47.     On July 13, Stager conducted an interrogation of Mr. Carlock, and Mr. Carlock stated the following: Hampton had called Mr. Carlock so that she could get a ride to the hospital, which he assumed was for her injured leg. When Mr. Carlock arrived to pick Hampton up, Mr. Carlock did not see any burn injury to Hampton's left arm. Hampton drove them to the hospital, and Mr. Carlock went home in the rental car.

48.     That day, the HWPD requested a warrant, with Closurdo identified as the Officer in Charge, which was reviewed and approved by Stager.

---

[9] As explained in the expert report of arson expert Robert Trenkle, water could not mask the odor of gasoline nor alter the results of gas chromatography-mass spectrometry testing by the Michigan State Police, which showed no trace of gasoline on any of Mr. Carlock's articles of clothing, as discussed below.

49. On July 14, Wayne County Prosecutor's Office recommended the issuing of a warrant and charged Mr. Carlock by information with (1) one count of assault with intent to murder, (2) one count of assault with intent to do great bodily harm less than murder, (3) one count of unlawfully driving away in a motor vehicle, and (4) one count of domestic violence. The information also included a habitual offender notice.

50. At a video hearing that same day before Chief Judge Coleman, Closurdo, as the complaining witness in support of the warrant, testified *ex parte* as follows. On July 12, 2021, at approximately 4:27 a.m., McCaw was dispatched to St. John's Hospital to take a report on an attempted homicide by burning. McCaw made contact Hampton, who advised him that the incident occurred on that date at approximately 3:00 a.m., at her house. Hampton advised McCaw that she woke up at about 1:00 a.m. and discovered that Mr. Carlock was gone with her keys, her phone, and her rental car. Hampton advised McCaw that she was able to contact Mr. Carlock through a Google app to find out where he was, and the two of them began to argue. Hampton stated that Mr. Carlock arrived back home at approximately 3:00 a.m. and continued to argue with her.

51. Closurdo testified further as follows. Hampton advised McCaw that Hampton stated that the argument became physical when he slapped her with his palm and threw her on the couch. Hampton stated that Mr. Carlock went outside and

came back into the house with a small gas can. Hampton advised McCaw that Mr. Carlock poured some gas on his hand and then began pouring gas on Hampton. Hampton stated that, while Mr. Carlock was pouring gas on her, Mr. Carlock said he was going to set her on fire and shoot himself in the head. Hampton advised McCaw that Mr. Carlock pulled out a lighter, stood over her, and began to spark the lighter, as she was lying on the couch. Per Hampton, after several attempts, Mr. Carlock ignited the lighter and set her arm on fire. Hampton stated that both she and Mr. Carlock patted her arm and put the fire out. After doing so, Hampton stated she went outside to get some air and wanted to go to the hospital. Hampton advised McCaw that Mr. Carlock would not let her go alone, so she drove to the hospital, and Mr. Carlock was in the passenger seat. Hampton stated that, upon arriving at the hospital, Hampton exited the vehicle and began to walk towards the emergency room, while Mr. Carlock exited the passenger seat, got into the driver's seat, and drove the vehicle away.

52. Closurdo testified further as follows. Closurdo and Heaney followed up with Hampton at the hospital, and they were able to get the security video of Hampton and Mr. Carlock arriving, which matched the story given by Hampton. Hampton confirmed the events and stated wanted to press charges. She also gave consent to Closurdo and Heaney to search the house and advised that a gas can was in the garage. Closurdo and Heaney went to the house, where they located two small

red gas cans in the garage, both containing a liquid that smelled like gas, which were recovered as evidence.

53.    Closurdo omitted that, besides the two small gas cans, there was zero physical evidence present at the purported crime scene—such as fire or smoke damage or the odor or presence of gasoline on the couch, nearby furniture, or anywhere else in the house. And Closurdo omitted that no other evidence, such as witness statements, to corroborate Hampton's story.

54.    Closurdo testified further as follows. While Closurdo and Heaney were conducting the search, Ruthenberg "did an exicant [sic] circumstance" on Mr. Carlock's phone and began receiving pings on the location of the phone. This led him to an apartment complex, where Ruthenberg and Stager surveilled the suspect vehicle being driven by Mr. Carlock, with an unknown female in the passenger's seat. Ruthenberg and Stager stopped the vehicle and took Mr. Carlock into custody.

55.    Closurdo advised the court that evidence that Hampton's clothes were collected as evidence and were "soaked in gasoline."

56.    Closurdo also advised the judge of Mr. Carlock's past convictions and that Mr. Carlock and Hampton had been together for about a year.

57.    Chief Judge Coleman found that there was probable cause supporting Mr. Carlock's arrest and that Mr. Carlock committed the charged offenses.

58.     Chief Judge Coleman then proceeded with Mr. Carlock's arraignment. Mr. Carlock, with the assistance of appointed counsel, pleaded not guilty.

59.     Mr. Carlock, through counsel, requested a GPS tether, considering he was taken into custody without incident; he was currently living with his mother; he suffered from asthma, chronic obstructive pulmonary disorder, and diabetes; and he had been employed at Home Depot.

60.     In response, Closurdo stated that "the charges do speak for themselves. Part of setting a bond is not only to ensure that he comes back to court, but to protect the public. The complainant here is in fear of her life, and I believe that a cash bond would be appropriate in this instance."

61.     Chief Judge Coleman issued a $150,000 cash or surety bond, with a GPS tether if Mr. Carlock was released, and scheduled Mr. Carlock's probable cause conference one week later and preliminary examination another week after that.

62.     Before the arraignment was adjourned, Mr. Carlock requested to speak. He stated that he would not be able to afford the bond, that he had never been a violent person, and that he would appear in court.

63.     Chief Judge Coleman responded that an attorney would be appointed to represent him for subsequent hearings, and that once evidence had been presented, she may change the bond. Chief Judge Coleman stated that, regardless, the bond would stand as it was.

64.     At no subsequent hearing did Chief Judge Coleman inquire into, or entertain evidence regarding, Mr. Carlock's ability to post a bond.

65.     On August 26, the Michigan State Police Forensic Science Division issued a report of its gas chromatography-mass spectrometry testing on the following items: (1) the clothing reportedly belonging to Hampton; (2) the clothing reportedly belonging to Mr. Carlock and found in the vehicle; and (3) samples of the liquid reportedly collected from the two gas cans. The report identified the presence of gasoline on Hampton's clothes and from the samples from the gas cans but found no identifiable presence of gasoline on any of Mr. Carlock's items of clothing.

66.     On September 15, Chief Judge Coleman conducted a preliminary examination, during which Hampton testified.

67.     After Hampton's testimony, Chief Judge Coleman commented that "there are some questionable facts that have been presented before this Court today" but, nevertheless, found that there was probable cause. Chief Judge Coleman bound Mr. Carlock over to the Third Circuit Court. Chief Judge Coleman maintained the cash or surety bond.

68.     On September 22, Mr. Carlock was arraigned by the Third Circuit Court, and his bond was continued.[10]

---

[10] Despite requests to obtain a transcript of this arraignment, the Third Circuit Court evidently did not record this hearing, and as such, the transcript could not be produced.

69.     On November 12, Mr. Carlock moved to quash his defective bindover based on Hampton's inconsistent and illogical testimony, which was not credible.

70.     On March 2, 2022, Mr. Carlock moved to dismiss, as the prosecutor had failed to produce discovery, as previously ordered by the court, and failed to bring his matter to trial within 180 days. Mr. Carlock also requested that he be released on a recognizance bond.

71.     On April 13, the Wayne County Prosecutor's Office moved to amend the information to include a notice that the habitual offender enhancement carried a 25-year mandatory sentence. The Third Circuit Court granted the motion on June 2.

72.     On May 16, the Third Circuit Court denied Mr. Carlock's motion to quash, finding that Chief Judge Coleman did not abuse her discretion in light of unresolved questions of fact. The Third Circuit Court also denied Mr. Carlock's motion to dismiss and request to be released on a personal recognizance bond, as discovery had ultimately been produced.

73.     On May 1, 2023, Mr. Carlock moved to dismiss for factual impossibility in light of Hampton's non-credible testimony and the expert report of arson expert Robert Trenkle, which found that Hampton's version of events was scientifically impossible.

74.     On May 23, the Third Circuit Court denied Mr. Carlock's motion to dismiss for factual impossibility for the same reasons it denied his motion to quash.

75.     On September 25, after a four-day trial, Mr. Carlock was acquitted of all charges by a jury of his peers. The jury's deliberation lasted less than one hour, before they returned a not guilty verdict on all counts.

76.     Despite his presumptive innocence, which was ultimately confirmed by the jury, Mr. Carlock spent over two years languishing in jail solely because he could not afford to post bail.

**B.     The 32A District Court's Arraignment Policies & Practices Constitute a Wealth-Based Detention System that Keeps People in Jail for the Sole Reason that They Cannot Afford Bail**

77.     The 32A District Court routinely imposes secured cash bail conditions on arrestees who appear before them for arraignment without justification. Secured cash bail conditions vary in amount and details, but all share the common trait of requiring the arrestee to pay money, either directly to the government or in the form of fees paid to a professional surety such as a bail bondsperson, to secure the arrestee's release from jail.

78.     Typically, such conditions take one of two forms: (1) a "10%" bail condition, which requires the arrestee to post at least 10% of the total bail amount in cash or real property as a security or else to have a surety, such as a professional bondsman, execute a bond for one-fourth of the total bail amount—a service for which most bondsmen charge 10% of the amount they have to guarantee; or (2) a full cash bail condition, which requires the arrestee to pay, or the professional surety

to execute a bond for, the entire bail amount—a service for which most bondsman charge 10% of the full bail amount. Either option requires out-of-pocket financial expenditure by the arrestee, either in the form of money paid directly to the government or else money paid to a bondsman as a non-refundable fee.

79.    Yet, as detailed below, the policy and practice of the 32A District Court is to offer no opportunity for an arrestee's indigency to be considered at the arraignment. As a result, indigent arrestees in Harper Woods are routinely detained after their arraignment without any consideration of whether they can afford to pay cash bail. Instead, secured cash bail conditions are imposed without any individualized consideration of, or constitutionally required findings regarding, the person's interest in pretrial liberty, whether the person poses an unmanageable risk of flight or identified and articulable danger to the community, and whether non-financial conditions could adequately protect against such risks.

      i.    <u>Prior to Arraignment, Indigent Arrestees Have No Way to Be Released from Detention</u>

80.    When a state district or circuit court judge issues an arrest warrant, the judge may, for most misdemeanors and city ordinance violations, provide for an interim secured cash bail of a specified amount. If the judge specifies interim bail on the warrant, an arrestee can purchase their release prior to arraignment by paying the specified amount. Because warrants are issued *ex parte*, an individual against whom

a warrant is issued has no chance to assert her indigency as a factor in the setting of interim bail.

81.    When a defendant is arrested without a warrant for allegedly committing a misdemeanor or violating a city ordinance that is punishable by not more than one year of imprisonment, he is detained until his arraignment unless he is offered and able to meet interim bail. By statute, an interim bond for warrantless arrests under this procedure may be offered for the minor offenses described above but must be in the amount of at least 20% of the minimum possible fine that can be imposed upon conviction.

82.    Arrestees charged with a felony or with a misdemeanor punishable by more than one year of imprisonment are ineligible by statute to be released on an interim bond and will typically remain detained until their arraignment.

83.    Detainees who are not offered interim bond, who are unable to pay interim bond, or who are ineligible for interim bond remain detained until their arraignment. Arraignments typically occur within approximately 48 hours of arrest on weekdays but can take longer.

        ii.    <u>Arraignments at the 32A District Court Are Not Hearings at Which Arrestees' Indigency Is Considered</u>

84.    Chief Judge Coleman presides over arraignments at the 32A District Court.

85.     The arraignments are summary affairs. A typical arrestee spends approximately less than 15 minutes on camera—the vast majority of which is spent having information read to him.

86.     If the arrestee is charged with a new felony (or felonies), Chief Judge Coleman sets a date for the next two appearances in court: a probable cause conference followed by a preliminary examination. By court rule, the probable cause conference must be set "not less than 7 days or more than 14 days after the date of the arraignment"; the preliminary examination must be scheduled "not less than 5 days or more than 7 days after the date of the probable cause conference."

87.     Chief Judge Coleman also sets secured cash bail conditions and other non-financial conditions that must be satisfied if the arrestee is to be released prior to the probable cause conference.

88.     The bail-setting phase of the arraignment typically lasts approximately 30 to 60 seconds. Chief Judge Coleman does not advise the arrestee that he has the right to have his ability to pay considered as part of the bail determination. She does not ask the arrestee if he has financial resources to pay for his release. And she does not provide any opportunity for the arrestee to offer evidence or proffers of evidence regarding his ability or inability to pay secured cash bail conditions.

89.     Chief Judge Coleman also does not ask the arrestees any questions that might help to determine whether the individual poses an identifiable and articulable

danger to the community or an unmanageable flight risk. Neither does she ask any questions about (or discuss) whether non-financial conditions could suffice to assure the arrestee's attendance at hearings in his case.

90.    In announcing the secured cash bail considerations, Chief Judge Coleman does not refer to any individualized findings regarding the relationship between the arrestee's ability to pay and any possible risk of flight or danger to the community.

91.    Thus, as a matter of policy and practice, the 32A District Court makes no attempt to determine an arrestee's financial situation, and they make no inquiry into or findings about each arrestee's ability to satisfy secured cash bail conditions.

92.    As a matter of policy and practice, the 32A District Court does not advise arrestees of their right to pretrial liberty or to have their ability to pay considered when setting bail conditions. Similarly, as a matter of policy and practice, the 32A District Court does not advise arrestees that they have a right to have non-financial bail conditions considered as a (preferred) alternative to secured cash conditions. Thus, as a matter of policy and practice, arrestees are routinely prevented and discouraged from presenting arguments and evidence that would be vital to a proper and lawful bail determination.

93.    For years, these policies have consistently resulted in the lengthy, needless, and devastating jailing of indigent individuals. Other arrestees with

financial means have been able to pay their predetermined money bail and secure their release.

94.     The remainder of this Complaint refers to the policies and practices of the 32A District Court, as described in this section, as the Court's "Arraignment Policies and Practices."

### iii.     After Arraignment, Arrestees Who Cannot Pay Their Bail Conditions Are Detained in Wayne County Jails

95.     After an arrestee is arraigned, the arrestee is transferred to the custody of the Wayne County Sheriff's office and is transported to one of the three jails operated by the Sheriff ("Wayne County Jails").

96.     If an arrestee posts bail, the arrestee is usually released within 24 hours, sometimes significantly faster. Otherwise, he remains in one of the Wayne County Jails until either he pays to be released or the criminal proceedings against him are completed or dismissed.

97.     The Wayne County Jails collectively house on average over 1,200 individuals every night.[11] Approximately over 60% of detainees in the Wayne County Jails are pretrial detainees.[12] Most pretrial detainees do not remain detained voluntarily but rather because they cannot afford to purchase their pretrial freedom.

---

[11] *See* Wayne Cnty. Sherriff Connect, *Wayne County Jail Dashboard*, https://www.sheriffconnect.com/dashboard/ (last visited Feb. 20, 2024).

[12] *See* Vera Incarceration Trends, *Wayne County, MI*, https://trends.vera.org/state/MI/county/wayne_county (last visited Feb. 20, 2024).

98.     It costs approximately $165 per night to detain a person in the Wayne County Jails.[13] Thus, taxpayers are paying hundreds of thousands of dollars *every night* to house pretrial detainees in the Wayne County Jails.

99.     Meanwhile, Wayne County has built a new $598 million detention center that will increase the total number of jail beds in Wayne County.[14]

      iv.     Chief Judge Coleman Has the Legal Authority to Release Arrestees on Their Own Recognizance or Under Non- Financial Bail Conditions but Fails to Do So

100.    Under the Michigan Constitution, all arrestees are entitled to bail by "sufficient sureties" except in four specific circumstances. The exceptions arise only when the proof of guilt is "evident or the presumption great" and when the person is charged with one of four categories of crimes: (1) murder or treason; (2) violent felonies that were allegedly committed while the accused was on probation, parole, or another form of release; (3) violent felonies in which the accused has already been convicted of two or more other violent felonies arising out of separate incidents in the past fifteen years; or (4) criminal sexual conduct in the first degree, armed

---

[13] *See* Ibrahim Samra, *Wayne County Jail Push for More Transparency with New Data Dashboard*, CBS News Detroit (Nov. 10, 2022), https://www.cbsnews.com/detroit/news/wayne-county-jail-push-for-more-transparency-with-new-data-dashboard/.

[14] *See* Louis Aguilar, *New Wayne Co. Criminal Justice Complex Nears Substantial Completion, Could Open in Mid 2024*, Detroit News (Dec. 14, 2023), https://www.detroitnews.com/story/news/local/wayne-county/2023/12/14/construction-of-wayne-county-jail-finished/71923302007/.

robbery, or kidnapping with an intent to extort.[15] Mich. Const. of 1963, art. I, § 15;
*see also* Mich. Ct. R. 6.106(B)(1).

101.   For all other charges, Michigan Court Rule 6.106(C) requires that the
arrestee be released on her own recognizance, or on an unsecured appearance bond,
unless the court specifically determines that unsecured release on personal
recognizance will not reasonably ensure the arrestee's appearance at future hearings
or will present a danger to the public.

102.   Even when an arrestee is not eligible for release on her own
recognizance, Michigan Court Rules 6.106(D)–(E) require that the court next
consider imposing non-financial release conditions. These non-financial conditions
may include requiring the arrestee to: (a) make reports to a court agency as are
specified by the court or the agency; (b) not use alcohol or illicitly use any controlled
substance; (c) participate in a substance abuse testing or monitoring program; (d)
participate in a specified treatment program for any physical or mental condition,
including substance abuse; (e) comply with restrictions on personal associations,
place of residence, place of employment, or travel; (f) surrender a driver's license or
passport; (g) comply with a specified curfew; (h) continue to seek employment; (i)
continue or begin an educational program; (j) remain in the custody of a responsible

---

[15] Arrestees in the fourth category are entitled to bail if there is clear and convincing
evidence that the defendant is not a flight risk or a danger to others.

member of the community who agrees to monitor the defendant and report any violation of any release condition to the court; (k) not possess a firearm or other dangerous weapon; (l) not enter specified premises or areas and not assault, beat, molest or wound a named person or persons; (m) comply with any condition limiting or prohibiting contact with any other named person or persons.; (n) satisfy any injunctive order made a condition of release; or (o) comply with any other condition that the court determines is reasonably necessary to ensure the arrestee's appearance and the safety of the public.

103.   Michigan Court Rules further provide that a court may impose secured cash bail conditions only as a matter of last resort after determining, for reasons stated on the record, that the arrestee's appearance at future hearings or the protection of the public cannot be ensured by the use of the numerous nonfinancial release conditions that are at the court's disposal. Mich. Ct. R. 6.106(E).

104.   As a result, people arrested in Michigan for most offenses have a liberty interest under state law in being released pending trial without secured cash bail conditions, absent a specific individualized finding that such conditions are necessary to protect the public or ensure attendance at future hearings.

105.   But under the Arraignment Policies and Practices, Chief Judge Coleman does not make any such findings, on the record or otherwise. Instead, secured cash bail conditions are routinely and presumptively imposed for most

offenses without any consideration of whether other, non-financial, conditions would suffice to ensure the arrestee's appearance or protect the public. In almost no instance does Chief Judge Coleman ever explain on the record how a cash bail condition serves to further either of these two purposes in anything other than the most generic, boilerplate fashion.

106.   The policies and practices described above are not simply a matter of flawed individual adjudications, but rather represent an administrative decision and policy by the 32A District Court to conduct arraignments that altogether deny arrestees any hearing at all at which their ability to pay is considered or assessed and weighed against the potential risks posed by their release. There are, to be sure, minor differences between how Chief Judge Coleman interacts with individual arrestees, but all arraignments follow the Arraignment Policies and Practices described above in all but the most exceptional cases.

v.   <u>Indigent Detainees Have No Viable Opportunity to Have Their Bail Reduced or Reconsidered for at Least One Week After Arraignment</u>

107.   The imposition of secured cash bail conditions at the arraignment is the moment of differential treatment: an arrestee with financial resources will pay her bail (or pay a bail bondsman) and be released shortly after the arraignment, while otherwise identical arrestees (such as Mr. Carlock and those similarly situated) who

cannot afford their secured cash bail conditions will be detained for at least an additional week—and likely much longer—as long as their bail remains unpaid.

**C.    The Period of Automatic Detention Resulting from Defendants' Policies and Practices Unconstitutionally Discriminates Against Indigent Defendants**

108.    As the result of the Arraignment Policies and Practices, the 32A District Court routinely sends indigent arrestees to jail without providing them with an opportunity for a bail hearing at which their indigency will even be mentioned. This policy causes extraordinary harm for indigent arrestees, and yet is completely ineffective at accomplishing any permissible judicial or governmental purpose, let alone being narrowly tailored to achieve a compelling governmental purpose, as required by the Due Process and Equal Protection clauses.

109.    Harper Wood's poverty rate in 2022, defined as the percentage of the population living below the federally determined poverty line, 20.1%, higher than the national rate and the rate for Michigan. Accordingly, Harper Woods has an even greater share of individuals who are unable to afford either secured cash bail conditions or legal representation than most communities.

110. The Federal Reserve recently reported that nearly 40% of adults in the U.S. are unable to pay a $400 emergency expense.[16] The percentage of citizens of Harper Woods unable to afford such expenses is almost certainly higher.

111. The inability to afford secured cash bail conditions falls disproportionately on communities of color.[17]

        i.     <u>The Arraignment Policies and Practices Inflict Severe Harm on Indigent Arrestees</u>

112. Sitting in jail for more than a week (let alone over two years)—at a time when a person is still presumed innocent—is an inherently harmful deprivation of liberty. Beyond jail time itself, a person who is detained for even a few days will often face serious collateral consequences that can devastate that person's life for years or decades to come.[18] At the very least, he is likely to lose income from missing

---

[16] *See* Bd. of Governors of the Fed. Rsrv. Sys., *Report on the Economic Well-Being of the U.S. Households 2022* (May 2023), https://www.federalreserve.gov/publications/files/2022-report-economic-well-being-us-households-202305.pdf.

[17] *See, e.g.*, Connor Concannon & Chongnim Na, *Examining Racial and Ethnic Disparity in Prosecutor's Bail Requests and Downstream Decision-making*. 16 Race & Soc. Probs. 1 (2023); David Arnold et al., *Racial Bias in Bail Decisions*, 133 Quarterly J. of Econ. 1885 (2018); Cynthia Jones & Nancy Gist, *Decision Points: Disproportionate Pretrial Detention of Blacks and Latinos Drives Mass Incarceration*, Huffington Post (Nov. 11, 2016), https://www.huffpost.com/entry/pretrial-detention-blacks-and-latinos_b_8537602.

[18] *See Barker v. Wingo*, 407 U.S. 514, 532–33 (1972) ("The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence,

work. Much worse, after two or three days, he is likely to face a serious risk of being fired altogether, a risk that dramatically increases with each additional day of detention. He may miss rent payments and get evicted. He may suffer setbacks in an educational program or miss important medical appointments. He may even lose custody of his children because of his inability to arrange childcare. Indeed, studies show what may already be obvious, namely that the results of pretrial detention can be quite long-lasting.[19]

113.   Largely as a result of the rapid effects of even short periods of pretrial detention, research shows that suicides are the leading cause of death in local jails and occur at a rate higher than in state prisons.[20] Indeed, more than one-third of such suicides occur during the first seven days of detention, a fact attributable to the shock of corresponding job and/or housing loss.[21]

114.   Unaffordable secured cash bail also inflicts harm on arrestees' families. All of the harms described above have obvious impacts on families. In addition, the

---

contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent.").

[19] *See* Will Dobbie et al., *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108 Am. Econ. Rev. 201, 235 (2018), https://pubs.aeaweb.org/doi/pdfplus/10.1257/aer.20161503.

[20] See E. Ann Carson, *Mortality in Local Jails, 2000-2019 – Statistical Tables*, U.S. Dep't of Just. (Dec. 2021), https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf.

[21] *See* Maurice Chammah & Tom Meagher, *Why Jails Have More Suicides Than Prisons*, Marshall Project (Aug. 4, 2015), https://www.themarshallproject.org/2015/08/04/why-jails-have-more-suicides-than-prisons.

loved ones of individuals who are given unaffordable bail are confronted with the difficult choice of allowing the arrestee to languish in jail or taking out unaffordable debts to cover the secured cash bail conditions—money that will never be returned to the family if it takes the form of fees paid to bail bondspersons. The result for indigent families is increased housing or food instability and other sacrifices that diminish the life chances of arrestees' children, spouses, parents, and other loved ones.

115.   For example, in addition to the severe and serious emotional distress, embarrassment, humiliation, and anxiety Mr. Carlock suffered during his two years of continuous detention in jail and continues to suffer to this day, Mr. Carlock lost his job, his car, and many personal belongings; was unable to see, support, and care for his four children, including when his oldest child's mother died; and has since been unable to secure long term employment.

116.   Rather than face these consequences resulting from extended delays before a bail hearing, research has shown that many people charged with low-level crimes simply plead guilty rather than spending weeks sitting in jail in order to assert their innocence.[22]

---

[22] *See* Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 736, 747 (2016), https://www.stanfordlawreview.org/print/article/the-downstream-consequences-of-misdemeanor-pretrial-detention/; Megan Stevenson, *Distortion of Justice: How the*

117.   To make matters worse, studies also show that individuals detained pretrial are, on average, given 42% longer jail sentences. In misdemeanor cases this can happen for the simple reason that the time already served before negotiating a plea bargain exceeds the sentence that is meted out to similar defendants who were released and later plead guilty.[23] Indeed, controlling for other factors, pretrial detention is the single greatest predictor of a conviction and a sentence to jail or prison time.[24]

118.   As discussed above, indigent arrestees in the 32A District Court have no chance to have their indigency considered in connection with bail until their probable cause hearing, which occurs at least a week after the arraignment. At that hearing, they often meet their attorneys for the first time, and the attorneys may lack helpful facts and evidence to argue persuasively for the elimination of any cash bail considerations. Even when the attorney is prepared to make such arguments, it is not

---

*Inability to Pay Bail Affects Case Outcomes*, 34 J.L., Econ. & Org. 511, 512, 532 (2018), https://academic.oup.com/jleo/article/34/4/511/5100740; Emily Leslie & Nolan G. Pope, *The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from New York City Arraignment*, 60 J.L. & Econ. 529 (2017), http://www.econweb.umd.edu/~pope/pretrial_paper.pdf.

[23] *See* Stevenson, *supra* note 22, at 513, 534–36; Heaton, *supra* note 22, at 717.

[24] *See* Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, Laura & John Arnold Found. (Nov. 2013), https://nicic.gov/resources/nic-library/all-library-items/investigating-impact-pretrial-detention-sentencing-outcomes; Mary T. Philips, *Pretrial Detention and Case Outcomes, Part 1: Nonfelony Cases*, N.Y.C. Crim. Justice Agency, Inc. (2007), https://www.nycja.org/assets/NonFelonyDetentionOutcomes07.pdf.

uncommon for district judges to postpone a decision on reducing bail until the next hearing (the preliminary examination), another five to seven days later. By contrast, a low-level arrestee who pleads guilty at the probable cause hearing in return for a time-served sentence can obtain immediate release. This effectively coerces some detainees to plead guilty, particularly those who face some of the harms discussed above, such as eviction, job loss, and loss of child custody.

    ii.    <u>The Arraignment Policies & Practices Do Not Further a Valid Judicial or Governmental Goal, Let Alone a Compelling One</u>

119. Empirical evidence shows that there is no relationship between requiring money bail as a condition of release and defendants' rates of appearance in court.[25] This finding has been affirmed by extensive fact-finding in multiple federal courts.[26]

---

[25] *See, e.g.,* Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J.L. Stud. 471, 475 (2016), https://www.journals.uchicago.edu/doi/abs/10.1086/688907; Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option*, Pre-Trial Just. Inst. (Oct. 2013), https://nicic.gov/resources/nic-library/all-library-items/unsecured-bonds-most-effective-and-efficient-pretrial.

[26] *See, e.g., ODonnell v. Harris Cnty.*, 882 F.3d 528, 545 (5th Cir. 2018) (upholding the district court's "thorough review of empirical data and studies [finding] that the County had failed to establish any 'link between financial conditions of release and appearance at trial or law-abiding behavior before trial'"); *Schultz v. Alabama*, 330 F. Supp. 3d 1344, 1362 (N.D. Ala. 2018) ("[Plaintiff] offered expert testimony and empirical studies to demonstrate that secured money bail is not more effective than unsecured bail or non-monetary conditions of release in reducing the risk of flight from prosecution.").

120.   As for public safety, secured bail is demonstrably harmful. Requiring people to pay for their release means that people with low incomes spend more time in jail. After brief periods of detention, each additional day a person spends locked in jail increases the likelihood that he will be rearrested after he is released, largely as a result of the economic harms he will have suffered as a result of his detention.[27]

121.   The use of secured bail also tends to have a severely disparate impact on Black and Latino arrestees. African Americans are five times more likely to be detained in the first place than their white counterparts, and three times more likely to be detained than their Latino counterparts.[28] In turn, African Americans and Latinos are more likely than whites to be held in continued detention because they cannot afford their bail.[29] As stated above, people who cannot afford to pay for their release—disproportionately African Americans and Latinos—are significantly more likely to abandon valid defenses and plead guilty just to get out of jail and they are more likely to receive longer jail sentences.

---

[27] *See* Heaton, *supra* note 22, at 762; Christopher T. Lowenkamp, et al., *The Hidden Costs of Pretrial Detention*, Laura & John Arnold Found. (Nov. 2013), https://nicic.gov/resources/nic-library/all-library-items/hidden-costs-pretrial-detention.

[28] *See, e.g., Bail Fail: Why the U.S. Should End the Practice of Using Money for Bail*, Just. Pol'y Inst. (Sept. 2012), https://justicepolicy.org/wp-content/uploads/2022/02/bailfail.pdf.

[29] *See* Stephen Demuth, *Racial and Ethnic Differences in Pretrial Release Decisions and Outcomes: A Comparison of Hispanic, Black and White Felony Arrestees*, 41 Criminology 873, 889–90, 899 (2003).

122.   In the Wayne County Jails, approximately 75% of the individuals being held pretrial on charges identified as Black.[30]

123.   The 32A District Court has other, more effective and less harmful, options for administering its arraignments and bail conditions. Recognizing the limitations and dangers of secured bail, other jurisdictions rely on alternative measures to ensure that people show up for court. The simplest of these measures is a personal bond, which means a person is released in exchange for his promise to pay money only if he actually fails to appear in court. A personal bond is equally effective at securing court appearances as secured bail.[31]

124.   In fact, personal bonds are an option easily available to Chief Judge Coleman. As described above, Michigan's court rules provide that personal bond is to be the rule, not the exception, for most offenses absent individualized evidence justifying an alternate approach. Yet in the 32A District Court, secured cash bail conditions imposed with no inquiry into an arrestee's indigency are common, and even when personal bonds are granted, they are not granted as a result of an inquiry into the arrestee's ability or inability to afford secured cash bail conditions.

125.   Other less discriminatory yet equally effective alternatives range from simple, low-cost interventions to help people appear in court, such as reminders of

---

[30] *See* Wayne Cnty. Sherriff Connect, *supra* note 11.
[31] *See, e.g., ODonnell*, 882 F.3d at 545; *see also* Gupta, *supra* note 25, at 21; Jones, *supra* note 25, at 11.

court dates and transportation to court,[32] to more intensive supervision, such as required reporting, curfews, maintaining existing employment or, in what should be unusual circumstances, electronic monitoring at no expense to the indigent arrestee.[33] The key to effective implementation of these alternatives is to tailor conditions of release or detention according to the needs and abilities of each individual.

126. This approach works. For example, Washington, D.C. has relied heavily on alternatives to cash bail for more than twenty years. The District of Columbia enjoys a reappearance rate of over 87%, with no rearrest for over 93% of people.[34] The cost of release is approximately $18 per person per day, compared with the cost of approximately $165 per person per day to lock someone in a Wayne County Jail.

---

[32] *See* Brice Cooke et al., *Using Behavioral Science to Improve Criminal Justice Outcomes: Preventing Failures to Appear in Court*, Univ. of Chi. Crime Lab (Jan. 2018), https://www.courthousenews.com/wp-content/uploads/2018/01/crim-just-report.pdf.

[33] *See* Christopher Lowenkamp & Marie VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes*, Laura & John Arnold Found. (Nov. 2013), https://nicic.gov/resources/nic-library/all-library-items/exploring-impact-supervision-pretrial-outcomes.

[34] *See PSA Performance Outcomes: FY 2018–2022*, Pretrial Servs. Agency for D.C. (Jan. 2023), https://www.psa.gov/sites/default/files/FY%202018-2022%20-%20Fact%20Sheet-PSA%20Performance%20Outcomes%20-%20rev.%20Superior%20Court.pdf; *see also* Tim Schnacke, *Fundamentals of Bail: A Resources Guide for Pretrial Practitioners & a Framework for American Pretrial Reform*, Nat'l Inst. of Corr. (2014), https://nicic.gov/resources/nic-library/all-library-items/fundamentals-bail-resource-guide-pretrial-practitioners-and.

127.   In fact, setting secured cash bail conditions that are unaffordable defeats the very purpose of secured cash bail conditions—to incentivize a person to return to court. If bail is set high enough that the arrestee cannot afford to pay, the arrestee remains in jail instead of leaving jail with some financial incentive to return. This fact removes any legitimate (let alone compelling) state interest in the setting of a financial condition. Unaffordable cash bail may be a backdoor way of indefinitely detaining an individual without quite saying so, but it does nothing to promote its supposed purpose of allowing the individual to be released with an incentive to return to court. In any event the Arraignment Policies and Practices do not keep all arrestees out of the community pretrial; they keep only poor arrestees who cannot afford bail out of the community while those who can afford to buy their freedom are able to leave jail, avoid collateral consequences of their arrest, and actively participate in their defense.

**D.    The 32A District Court's Arraignment Policies and Practices Deprive People of Liberty Without Adequate Procedural Protections and Without Constitutionally Required Findings**

128.   The Arraignment Policies and Practices also violate procedural due process by depriving people of their liberty without adequate procedural protections.

129.   As described above, bail is initially set by Chief Judge Coleman at arraignment. Yet, by their design, the Arraignment Policies and Practices deprive

arrestees of notice of the basis upon which bail is being determined and notice that their ability to pay is, or at least should be, relevant.

130.  Thus, instead of holding a bail hearing, Chief Judge Coleman simply imposes secured cash bail conditions via a cursory and summary procedure that lacks any of the hallmark protections that are required before a person can constitutionally be deprived of his liberty prior to trial: a counseled hearing where the person can present and rebut evidence concerning flight risk or danger to the community; advance notice of the hearing; and individualized, reasoned findings, by clear and convincing evidence, that no other non-financial release conditions could address any risk of flight or danger to the community.

131.  The 32A District Court could provide a constitutionally adequate pretrial detention proceeding at arraignment that would be consistent with Michigan law. Instead, it continues to operate a pretrial detention system based on wealth.

## CLASS ACTION ALLEGATIONS

132.  In addition to his individual claim for monetary damages against the Harper Woods Defendants, Mr. Carlock seeks injunctive and/or declaratory relief, on behalf of himself and all others similarly situated, under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, against Defendants Wayne County and the 32A District Court.

133.   Mr. Carlock also seeks monetary damages, on behalf of himself and all others similarly situated, under Rules 23(a) and 23(b)(2), against Defendants Wayne County and Harper Woods.

134.   Mr. Carlock seeks to represent the following class: pretrial detainees whose bail was set at arraignments in the 32A District Court in the City of Harper Woods, Wayne County, Michigan, and who, as a result of policies and practices followed by the 32A District Court when setting bail, faced and face detention in the Wayne County jails because they were or are unable to pay imposed secured cash bail conditions.

135.   This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

**1.     Numerosity, Fed. R. Civ. P. 23(a)(1)**

136.   Arrestees that come before the 32A District Court in the City of Harper Woods are jailed in Wayne County Jails. The Wayne County jail system is the largest and busiest county jail system in Michigan, with the capacity to incarcerate over 2,900 people and with an average daily population of over 1,200 detained individuals. Approximately over 60% of the detained people in Wayne County Jails are pretrial arrestees. The vast majority of arrestees from Harper Woods who fail to post bond do so because they cannot afford to meet the secured cash bail conditions imposed under the Arraignment Policies and Practices. As a result, the number of

past, current, and future arrestees subject to the Arraignment Policies and Practices easily numbers in the hundreds.

137.   The population of people detained pretrial is constantly changing. People are regularly arraigned in the 32A District Court in the City of Harper Woods, and a significant proportion are detained after failing to satisfy secured cash bail conditions imposed at the arraignment. In turn, arrestees exit the class at unpredictable intervals as their cases are resolved through plea bargains, dismissals, and trial. Or, if they are eventually bailed out despite their indigency, this often occurs only because the arrestee has taken on unaffordable debt in order to secure her release or because of the fortuitous intervention of a charitable third party.

138.   Joinder is impracticable because the class is both too numerous and too fluid for the Court to feasibly hear their independent claims.

139.   Joinder is also impracticable because most, if not all, the members of the class are, by definition, too poor to hire lawyers to bring independent claims.

### 2.   Commonality, Fed. R. Civ. P. 23(a)(2)

140.   The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class. Mr. Carlock seeks a declaratory judgment that the 32A District Court's Arraignment Policies and Procedures are unconstitutional, and an order enjoining them, on grounds that they violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

Mr. Carlock also seeks an injunction prohibiting the Sheriff and Wayne County from detaining arrestees after the arraignment absent assurances that an actual bail hearing has occurred at which indigency and ability to pay are properly considered. And Mr. Carlock seeks monetary damages from Wayne County and Harper Woods for their custom of acquiescence or tolerance of the constitutional violations that arise from the Arraignment Policies and Procedures.

141.    These claims and remedies are common to the entire class and would apply equally to all class members. Furthermore, the Arraignment Policies and Practices apply openly and in materially the same manner with respect to people arraigned at the 32A District Court. Resolution of the legal and factual issues raised by this Complaint will determine whether all the members of the class are entitled to the constitutional relief that they seek.

142.    Among the most important common questions of fact are:

- Whether the 32A District Court has a widespread, well-settled policy and practice of setting secured cash bail conditions without inquiring into ability to pay and without considering alternative less restrictive bail conditions;

- Whether the 32A District Court has a widespread, well-settled policy and practice of setting unaffordable secured bail for indigent arrestees without adequate procedural protections, including notice, an opportunity to present and contest evidence, and reasoned findings based on clear and convincing individualized evidence on the record that there are no less restrictive means of mitigating any unmanageable flight risk or identifiable and articulable danger to the community;

- Whether the 32A District Court is deliberately blind to evidence of indigency, and when and how such information is made available to the 32A District Court;

- Whether the Arraignment Policies and Practices are known to, approved of, and/or ordered by Chief Judge Coleman;

- Whether the secured cash bail conditions imposed by the 32A District Court at arraignments result in pretrial detention, and the length of such pretrial detention;

- How long class members must wait in jail after arrest before they have a meaningful opportunity, if at all, to raise their inability to pay for their release or to request alternative, non-financial conditions;

- Whether the Arraignment Policies and Practices resulted in a clear and persistent pattern of violating federal rights, and whether Defendants Wayne County and/or Harper Woods knew or should have known of such pattern; and

- Whether Defendants Wayne County and/or Harper Woods tacitly approved of the Arraignment Policies and Practices and/or were deliberately indifferent towards the pretrial detention of indigent arrestees under the Arraignment Policies and Practices, such that their custom was a direct causal link for the constitutional deprivations suffered by indigent arrestees.

143. Among the most important common questions of law are:

- Whether imposing unaffordable secured cash bail without providing a hearing at which the arrestee may have his inability to pay properly considered violates Substantive Due Process and Equal Protection protections guaranteed by the Fourteenth Amendment by discriminatorily depriving indigent arrestees of their liberty while wealthier arrestees are able to secure their pretrial freedom;

- Whether the Arraignment Policies and Practices violate the Procedural Due Process protections of the Fourteenth Amendment by depriving the class members of their pretrial

liberty without adequate procedural protections including notice, an opportunity to present and contest evidence, and reasoned individualized findings on the record that unaffordable secured bail is the least restrictive means of mitigating any risk of flight or danger to the community; and

- Whether Defendants Wayne County and/or Harper Woods had a custom of tolerance or acquiescence to constitutional violations attending the pretrial detention of indigent arrestees under the Arraignment Policies and Practices.

### 3.    Typicality, Fed. R. Civ. P. 23(a)(3)

144.   Mr. Carlock's claims are typical of the claims of the other members of the class. Each class member suffered, suffers, or will suffer, the same injury because the 32A District Court fails to comply with basic constitutional requirements. Namely, all class members have been confined, are confined, or will be confined in jail because they cannot afford to pay secured cash bail conditions that they had no opportunity to contest because they were denied a hearing at which indigency could be considered. The answer to whether the Arraignment Policy and Practices are constitutional will determine the claims of the named Plaintiffs as well as every other class member.

145.   If Mr. Carlock succeeds in the claim that the Arraignment Policies and Practices violate his constitutional rights, that ruling will likewise benefit every other member of the class.

### 4.     Adequacy, Fed. R. Civ. P. 23(a)(4)

146.   Mr. Carlock is an adequate representative of the Class because his interests in the vindication of his legal claims is entirely aligned with the interests of the other class members, each of whom has the same basic constitutional claims. Mr. Carlock is a member of the Class, and his interests do not conflict with those of the other Class Members.

147.   There are no known conflicts of interest among members of the proposed Class. All the respective Class Members have a similar interest in vindicating their constitutional rights by receiving a hearing in which their indigency is properly considered pursuant to constitutional standards.

148.   Mr. Carlock is represented by attorneys from Akeel & Valentine PLC. Counsel have extensive combined experience litigating class actions and complex civil rights matters in federal court and extensive knowledge of both the details of the 32A District Court's Arraignment Policies and Procedures and the relevant constitutional and statutory law. Counsel includes litigators who have specific experience with this type of claim, having litigated similar issues in lawsuits in this Court.

149.   Counsel has a detailed understanding of state law and practices as they relate to federal constitutional requirements.

150.   Counsel has devoted significant time and resources to becoming familiar with the 32A District Court's and Wayne County jails' pretrial detention practices and with the relevant state and federal laws and procedures that can and should govern them. The interests of the members of the Class will be fairly and adequately protected by Mr. Carlock and his attorneys.

### 5.   Injunctive & Declaratory Relief Are Appropriate, Fed. R. Civ. P. 23(b)(2)

151.   Class-action status under Rule 23(b)(2) is appropriate because the Defendants Wayne County, 32A District Court, and Harper Woods, through the Arraignment Policies and Practices and resulting pretrial detention of indigent arrestees, have acted in the same unconstitutional manner with respect to all Class Members.

152.   Mr. Carlock seeks declaratory and/or injunctive relief prohibiting Defendants Wayne County and the 32A District Court from continuing to administer their Arraignment Policies and Practices. Mr. Carlock also seeks monetary damages from Defendants Wayne County and Harper Woods for their custom of tolerance or acquiescence to the pretrial detention of indigent arrestees pursuant to the Arraignment Policies and Practices. The relief sought is appropriate for the Class as a whole.

## INDIVIDUAL COUNT ONE

**42 U.S.C. § 1983**
**Violation of Fourth Amendment: False Arrest & Unlawful Detention Without**
**Probable Cause**
**Against Defendants Heaney, Closurdo, McCaw, Ruthenberg, & Stager**

153.   Plaintiff incorporates by reference paragraphs 1 to 131, as fully set forth herein.

154.   Mr. Carlock has a constitutional right, guaranteed by the Fourth Amendment, to be free of unreasonable search and seizure not supported by probable cause. U.S. Const., amend. IV.

155.   A plaintiff may bring a Fourth Amendment § 1983 claim to seek relief from his (pre-legal-process) arrest as well as his (post-legal-process) pretrial detention, when they are unsupported by probable cause. *Manuel v. City of Joliet*, 580 U.S. 357, 368 (2017).

156.   Defendants Heaney, Closurdo, McCaw, Ruthenberg, Sparks, and Stager almost entirely relied on the factually impossible statements of Hampton, which were insufficient to establish probable cause to arrest Mr. Carlock and subject him to criminal prosecution and pretrial detention for over two years.

157.   The statement Hampton gave to McCaw described Mr. Carlock throwing Hampton on a couch, purportedly pouring gasoline all over Hampton and on himself (specifically his hands), igniting it with a lighter (using his gasoline-covered hands), and putting the fire out (again, with gasoline-covered hands) with

Hampton's help (who was herself purportedly covered in gasoline). Yet Mr. Carlock did not need any medical assistance for burns, and McCaw noted that the burn on Hampton, localized to under her arm, was "minor".

158. Additionally, Hampton reported to McCaw that Hampton had hit her face, despite the lack of any evidence of any physical injury to her face.

159. McCaw's own report additionally contains factual inaccuracies. Namely, McCaw (who had a previous history of contacts with Mr. Carlock) stated that Carlock had "a long history" of unlawfully driving away in an automobile ("UDAA"), possessing a firearm as a felon, and domestic violence assault. However, Carlock had never been convicted of UDAA, had only been convicted of possessing a firearm once over 10 years prior, and had been involved in one prior reported domestic violence situation for which he was not charged. Additionally, McCaw stated that Mr. Carlock was "armed/dangerous", despite Hampton specifically denying that she had ever seen a gun during the purported incident.

160. In their consensual search, Heaney and Closurdo merely uncovered the presence of two small gas cans in a garage and found zero physical evidence present at the purported crime scene—such as fire or smoke damage or the odor or presence of gasoline on the couch, nearby furniture, or anywhere else in the house. Heaney and Closurdo took no samples from the house for testing. Heaney and Closurdo did not attempt to take witness statements to corroborate Hampton's story.

161.   Despite the lack of probable cause, Stager, with Ruthenberg's assistance, located and arrested Mr. Carlock without a warrant.

162.   During Stager's interrogation, Mr. Carlock confirmed what was shown on the hospital surveillance footage: Hampton drove to the hospital with Mr. Carlock as a passenger, and Mr. Carlock (who was arrested wearing the same clothes on the night of the purported incident) then got in the driver's seat and drove away.

163.   Despite the lack of probable cause, Defendants Closurdo and Stager prepared an arrest warrant and sought a warrant recommendation from the Wayne County Prosecutor's Office.

164.   At the arraignment, Closurdo's testimony in support of the arrest warrant entirely omitted that, besides the two small gas cans, there was zero physical evidence present at the purported crime scene—such as fire or smoke damage or the odor or presence of gasoline on the couch, nearby furniture, or anywhere else in the house. And Closurdo omitted that no other evidence, such as witness statements, to corroborate Hampton's story.

165.   Because of these glaring omissions, Chief Judge Coleman found probable cause to support the arrest warrant.

166.   The release one month after Mr. Carlock's arrest of the Michigan State Police Forensic Science Division GC-MS report, which showed no indications of

gasoline on any item of Mr. Carlock's clothing that he wore on the night of the purported incident, further established the lack of probable cause.

167. The conduct of Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager described herein violated Mr. Carlock's right to be free from unreasonable seizure and unlawful detention as guaranteed by the Fourth Amendment to the U.S. Constitution.

## INDIVIDUAL COUNT TWO

### 42 U.S.C. § 1983
### Violation of Fourth Amendment: Unreasonable Search Without a Warrant Against Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, & Stager

168. Plaintiff incorporates by reference paragraphs 1 to 131, as fully set forth herein.

169. A warrant supported by probable cause is generally required to search a person's cell phone account information, cell phone call logs, and cell phone location information, such as GPS. *Riley v. California*, 573 U.S. 373, 386 (2014); *Carpenter v. United States*, 585 U.S. 296, 309–10 (2018).

170. Ruthenberg conducted a warrantless search through an exigent circumstances request to Mr. Carlock's cell phone provider for his account information, 48 hours of call logs with cell tower information, and his GPS location.

171. No exigent circumstances existed to justify Ruthenberg's warrantless search.

172.   There was no imminent threat of the destruction of evidence, as (1) McCaw, Heaney, and Closurdo had already interviewed Hampton; (2) Heaney and Closurdo had already conducted searches of the house and garage; and (3) any relevant cell phone records (such as the account information and call logs) were not at risk of being destroyed and could be acquired with a duly executed warrant.

173.   No person needed assistance for serious injury or was threatened with imminent injury, as the only purported victim, Hampton, was already receiving treatment in the security of a hospital. Moreover, Hampton denied seeing Mr. Carlock in possession of a gun.

174.   And there was no "hot pursuit", i.e., an immediate or continuous pursuit of a suspect by law enforcement officers from the scene of a crime. Plus, McCaw had been told by Hampton that Mr. Carlock could likely be located, namely his mother's house.

175.   This unjustified warrantless search of Mr. Carlock's account information, cell phone call logs, and cell phone location information resulted in Mr. Carlock's warrantless arrest and pretrial detention, which were unsupported by probable cause.

176.   The conduct of Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager described herein violated Mr. Carlock's right to be free from

53

unreasonable, warrantless searches as guaranteed by the Fourth Amendment to the U.S. Constitution.

## INDIVIDUAL COUNT THREE

### 42 U.S.C. § 1983
### Violation of Fourth & Fourteenth Amendments: Malicious Prosecution Against Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, & Stager

177.   Plaintiff incorporates by reference paragraphs 1 to 131, as fully set forth herein.

178.   To make out a malicious prosecution claim under § 1983, a plaintiff must show that legal process was instituted without probable cause and that the criminal prosecution was terminated in the plaintiff's favor. *Thompson v. Clark*, 596 U.S. 36, 44 (2022).

179.   As described in detail above, Mr. Carlock's warrantless arrest, pretrial detention, and criminal prosecution were not supported by probable cause. Yet Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager proceeded to conduct a warrantless arrest of Mr. Carlock and to subject him to over two years of pretrial detention and criminal prosecution.

180.   The criminal prosecution of Mr. Carlock was terminated in his favor, as he was acquitted of all charges by a jury of his peers.

181.   The conduct of Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager described herein violated Mr. Carlock's right to be free from

malicious prosecution as guaranteed by the Fourth and Fourteenth Amendments to the U.S. Constitution.

### INDIVIDUAL COUNT FOUR

**42 U.S.C. § 1983**
**Violation of Eighth Amendment: Excessive Bail**
**Against Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, & Stager**

182.   Plaintiff incorporates by reference paragraphs 1 to 131, as fully set forth herein.

183.   Law enforcement officers may be liable under 42 U.S.C. § 1983 for violation of the Excessive Bail Clause if the officers "deliberately or recklessly misled the [court] and . . . the [plaintiff's] bail would not have been unconstitutionally excessive but for the officers' misrepresentations." *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 661 (9th Cir. 2007).

184.   Defendant Closurdo deliberately or recklessly misled Chief Judge Coleman at the arraignment when he omitted numerous material facts from the investigation conducted by Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager that influenced Chief Judge Coleman's excessive bail determination.

185.   Namely, Closurdo omitted that, besides the two small gas cans, there was zero physical evidence present at the purported crime scene—such as fire or smoke damage or the odor or presence of gasoline on the couch, nearby furniture, or

anywhere else in the house. Closurdo also omitted that no other witness statements were sought to corroborate Hampton's story.

186.   Due to these glaring omissions, Chief Judge Coleman imposed excessive bail on Mr. Carlock.

187.   The conduct of Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager described herein violated Mr. Carlock's right to be free from excessive bail as guaranteed by the Eighth Amendment to the U.S. Constitution.

## <u>INDIVIDUAL COUNT FIVE</u>

**42 U.S.C. § 1983**
**Civil Conspiracy**
**Against Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, &**
**Stager**

188.   Plaintiff incorporates by reference paragraphs 1 to 131, as fully set forth herein.

189.   A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). The elements of a § 1983 civil conspiracy are: "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed" in furtherance of the conspiracy. *Id*.

190.   Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager had a single plan to arrest, detain, and prosecute Mr. Carlock.

191. Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager shared a conspiratorial objective to deprive Mr. Carlock of his constitutional rights under the Fourth, Eighth, and Fourteenth Amendments, as set forth above.

192. Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager each committed overt acts in furtherance of the conspiracy.

The conspiracy to deprive Mr. Carlock of his constitutional rights resulted in damages and injury to Mr. Carlock, who was detained for over two years without probable cause and under excessive bail conditions despite his presumptive innocence, which was ultimately confirmed by the jury.

### INDIVIDUAL COUNT SIX

**42 U.S.C. § 1983**
***Monell* Liability for Failure to Train**
**Against Defendant Harper Woods**

193. Plaintiff incorporates by reference paragraphs 1 to 131, as fully set forth herein.

194. Defendants Harper Woods may be liable under § 1983 for constitutional violations arising from their failure to train their employees properly. *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006).

195. The elements of a failure-to-train claim are: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was

closely related to or actually caused the injury. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)

196. A plaintiff can rely on a single incident to establish liability "if the risk of the constitutional violation is so obvious or foreseeable" that it amounts to deliberate indifference for the municipality to fail to prepare its officers for it. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020)

197. Defendant Harper Woods failed to train investigators, including Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager, of their constitutional obligations to *inter alia* (1) properly conduct warrantless arrests with probable cause; (2) properly conduct searches with a warrant supported by probable cause in the absence of a true exigent circumstance; (3) properly institute legal process with probable cause; and (4) refrain from deliberately or recklessly misleading courts in a manner that results in unconstitutionally excessive bail.

198. The failures of Harper Woods to provide adequate training and supervision to investigators is shown by "obvious or foreseeable" risk of the conduct of Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager resulting in violations of Mr. Carlock's constitutional rights.

199. The failures of Harper Woods to implement different or additional training for their officers were so apparent that their failures to do so are properly characterized as deliberate indifference to Mr. Carlock's constitutional rights.

200. The failures of Harper Woods to adequately train and supervise their officers were the moving force behind Mr. Carlock's unlawful arrest and pretrial detention without probable cause.

201. As a direct and proximate result of Harper Woods' failures to train and supervise and deliberate indifference, Mr. Carlock was arrested and detained without probable cause and deprived of his liberty, as presumptively innocent person, for over two years, causing him to suffer the injuries discussed herein.

## INDIVIDUAL COUNT SEVEN

### Violation of Michigan State Law: Gross Negligence
### Against Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, & Stager

202. Plaintiff incorporates by reference paragraphs 1 to 131, as fully set forth herein.

203. Under Michigan law, law enforcement officers are not immune from liability for tortious conduct done in the course of their employment when that conduct amounts to gross negligence that is the proximate cause of a plaintiff's injury or damage. Mich. Comp. Laws § 691.1047(2)(c).

204. "Gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results. Mich. Comp. Laws § 691.1407(8)(a).

205.   At all relevant times, Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager were acting in the course of their employment for the HWPD and within the scope of their authority performing the governmental function of investigating crimes.

206.   Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager were under a duty to avoid engaging in conduct so reckless as to demonstrate a substantial lack of concern for whether injury results.

207.   Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager engaged in grossly negligent conduct with regard to their investigation, arrest, and prosecution of Mr. Carlock. Specifically, Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager engaged in conduct so reckless as to demonstrate a substantial lack of concern as to whether Mr. Carlock would wrongfully be arrested, detained, and convicted.

208.   Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager breached their duty by apprehending Mr. Carlock, causing him to be apprehended, and/or prosecuted without probable cause.

209.   Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager breached their duty by engaging in the unconstitutional conduct set forth above.

210.   Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager breached their duty by failing to diligently investigate.

211.   Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager grossly negligent conduct was the proximate cause of Mr. Carlock's arrest, pretrial detention, and criminal prosecution.

212.   As a direct and proximate result of such conduct, Mr. Carlock suffered harm, including, but not limited to, loss of freedom, severe and serious emotional distress, embarrassment, humiliation, and anxiety for which he is entitled to compensatory and exemplary damages.

213.   Defendants Heaney, Closurdo, McCaw, Sparks, Ruthenberg, and Stager are liable for Mr. Carlock's injuries and damages under Mich. Comp. Laws § 691.1407.

## **RELIEF REQUESTED FOR INDIVIDUAL CLAIMS**

214.   Plaintiff requests that this Court issue the following relief:

a.   An order entering judgment in favor of Plaintiffs and against the Harper Woods Defendants;

b.   An award judgment against the Harper Woods Defendants for compensatory damages, which include, but are not limited to, non-economic and economic damages, all damages recoverable under the U.S. Constitution, 42 U.S.C. § 1983 and/or the laws of the State of Michigan, and punitive damages;

c.   An order granting reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

d.   Any other relief this Court deems proper and just.

## CLASS COUNT ONE

### 42 U.S.C. § 1983
### Violation of Equal Protection & Due Process: Wealth-Based
### Discriminatory Detention
### Against Defendants 32A District Court & Wayne County

215.   Plaintiff incorporates by reference paragraphs 1 to 152, as fully set forth herein.

216.   Under the 32A District Court's Arraignment Policies and Practices, Chief Judge Rebekah Coleman caused Mr. Carlock to be continuously locked in Wayne County jail for over two years because he was unable to pay secured cash bail conditions, while releasing otherwise similarly situated people who are able to pay. The 32A District Court's wealth-based system of imprisonment locks poorer—but still presumptively innocent—people, like Mr. Carlock and Class Members, in Wayne County jails while allowing wealthier individuals accused of the same crimes and with similar criminal backgrounds to go free until trial.

217.   Chief Judge Coleman routinely set this unaffordable secured bail amount without any individualized inquiry into or findings concerning: (1) the arrestee's ability to pay; (2) whether clear and convincing evidence demonstrates that the arrestee presents an unmanageable flight risk or identifiable and articulable danger to the community; and (3) whether other less restrictive, non-financial conditions could instead suffice to address any concerns regarding protection of the public or flight risk.

218. Despite the constitutionally deficient bail determination, Sheriff Washington jailed Mr. Carlock in the Wayne County jail for over two years simply because Mr. Carlock had no ability to pay. Sheriff Washington detains indigent arrestees, like Class Members, after arraignment despite the absence of a constitutionally adequate inquiry into the arrestee's ability to satisfy any secured cash bail conditions.

219. The 32A District Court's wealth-based Arraignment Policies and Practices violate Mr. Carlock and Class Members rights to Equal Protection and Due Process under the Fourteenth Amendment to the U.S. Constitution.

## CLASS COUNT TWO

**42 U.S.C. § 1983**
**Violation of Substantive Due Process:**
**Unjustified Pretrial Detention**
**Against Defendants 32A District Court & Wayne County**

220. Plaintiff incorporates by reference paragraphs 1 to 152, as fully set forth herein.

221. Under the 32A District Court's Arraignment Policies and Practices, Chief Judge Coleman set unaffordable secured bail that functionally deprived Mr. Carlock of his pretrial liberty via a summary arraignment process that involved no opportunity for Mr. Carlock or Class Members to introduce evidence or address proper bail conditions.

222.   These unaffordable bail amounts function as *de facto* pretrial detention orders. Chief Judge Coleman sets these unaffordable bail amounts without providing advance notice of the rights at stake, the opportunity to present or contest evidence, or a written record of reasoned findings by clear and convincing evidence that secured bail in the amount set is the least restrictive means of achieving a valid and compelling government interest. Nor does Chief Judge Coleman make any formal determination—let alone an individualized written determination by clear and convincing evidence—that the individual poses an unmanageable flight risk or a specific and articulable threat to the community.

223.   Sheriff Washington jailed Mr. Carlock in the Wayne County jail for over two years despite the imposition of a constitutionally deficient *de facto* pretrial detention order. Sheriff Washington detains indigent arrestees, like Class Members, in Wayne County jail after this summary arraignment process that fails to provide an arrestee a constitutionally sufficient opportunity to challenge the imposition of a *de facto* pretrial detention order.

224.   The 32A District Court's Arraignment Policies and Practices fail to adequately justify the pretrial deprivation of liberty of arrested persons, including Mr. Carlock and Class Members, thus violating the right to substantive due process guaranteed by the Fourteenth Amendment to the U.S. Constitution.

## CLASS COUNT THREE

### 42 U.S.C. § 1983
### Violation of Procedural Due Process:
### Failure to Provide Adequate Hearings Before Depriving a
### Guaranteed Liberty Interest
### Against Defendants 32A District Court & Wayne County

225.   Plaintiff incorporates by reference paragraphs 1 to 152, as fully set forth herein.

226.   Under the Arraignment Policies and Practices, Chief Judge Coleman does not make any individualized findings that arrestees, including Mr. Carlock and Class Members, presented an unmanageable flight risk or an identifiable and articulable danger to others if they are released, nor does Chief Judge Coleman make any individualized findings that non-financial bail conditions will not suffice to address any such risks.

227.   The Michigan Constitution guarantees a right to bail by "sufficient sureties" to all arrestees, with the very limited exception of four enumerated groups of the criminally accused who may be detained without bail if "the proof is evident or the presumption great." The Michigan Court Rules further create a state-conferred expectation of release without secured cash bail unless a court has made a specific individualized finding on the record that an arrestee's appearance or the protection of the public cannot otherwise be assured. The 32A District Court's Arraignment Policies and Procedures, by contrast, result in unaffordable cash bail being

presumptively imposed and without the requisite findings being made. Nor are any other procedural protections provided to ensure that arrestees' liberty interests are not erroneously extinguished.

228.   Sheriff Washington jailed Mr. Carlock in the Wayne County jail for over two years despite the absence of constitutionally required procedural protections during his summary arraignment. Sheriff Washington detains indigent arrestees, like Class Members, in Wayne County jail after this summary arraignment process where unaffordable cash bail is presumptively imposed without the requisite procedural protections to ensure that an arrestee's liberty interests are not unconstitutionally deprived.

229.   The 32A District Court's Arraignment Policies and Procedures deprive arrestees, like Mr. Carlock and Class Members, of a state-guaranteed liberty interest without sufficient procedural protections and without any adequate countervailing government interest. Therefore, the Arraignment Policies and Practices violate the Mr. Carlock's and Class Members' right to procedural due process guaranteed by the Fourteenth Amendment to the U.S. Constitution.

## **CLASS COUNT FOUR**

### **42 U.S.C. § 1983**
### *Monell* **Liability for Custom of Tolerance or Acquiescence to Constitutional Violations**
### **Against Defendants Wayne County & Harper Woods**

230. Plaintiff incorporates by reference paragraphs 1 to 152, as fully set forth herein.

231. Defendants Wayne County and Harper Woods may be liable under § 1983 for a custom of tolerance or acquiescence to federal violations, the elements of which are: (1) the existence of a clear and persistent pattern of violating federal rights; (2) notice or constructive notice on the part of defendants; (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) that the defendants' custom was the direct causal link for the constitutional deprivation. *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007).

232. Pattern of pretrial detention of indigent arrestees under the Arraignment Policies and Procedures is clear and persistent and resulted in the violation of Mr. Carlock's and Class Members' federal rights to equal protection and substantive and procedural due process under the Fourteenth Amendment.

233. Defendant Wayne County, which funds, maintains, and operates the Wayne County jails, knew or should have known that indigent arrestees, such as Mr.

Carlock and Class Members, were detained in its jails under the constitutionally deficient Arraignment Policies and Procedures.

234. Defendant Harper Woods, which, as the district funding unit for the 32A District Court, is responsible for maintaining, financing, and operating the 32A District Court, knew or should have known that the 32A District Court had implemented the Arraignment Policies and Procedures, resulting in the unconstitutional pretrial detention in Wayne County jails of indigent arrestees that fell under the 32A District Court's jurisdiction, like Mr. Carlock and Class Members.

235. Wayne County and Harper Woods tacitly approved of the Arraignment Policies and Procedures, such that their deliberate indifference in failing to prevent the unconstitutional pretrial detention of indigent arrestees, like Mr. Carlock and Class Members, amounted to official policies of inaction.

236. The custom of acquiescence or tolerance by Wayne County (which detained Mr. Carlock and Class Members in its jails) and by Harper Woods (which maintains, finances, and operates the 32A District Court) was the direct causal link for the constitutional deprivations suffered by Mr. Carlock and Class Members.

237. As a result, Class Members suffered damages, including mental and emotional distress, during the duration of their imprisonment for not being able to post bail.

## RELIEF REQUESTED FOR CLASS CLAIMS

238.   Plaintiff requests that this Court issue the following relief:

a.   An order entering judgment in favor of Plaintiff and Class Members and against Defendants 32A District Court, Wayne County, and Harper Woods;

b.   A declaratory judgment that the Arraignment Policies and Procedures violate Plaintiff's and Class Members' rights to equal protection and due process, as set forth above;

c.   A permanent injunction prohibiting the 32A District Court from maintaining the Arraignment Policies and Practices described above, and from failing to provide a bail hearing with constitutionally adequate findings and procedures, at which arrestees are not unjustifiably detained due to their inability to afford cash bail. Such hearings must occur promptly after arrest and include:

i.   Advance written notice to the arrestee of the factors to be considered in setting bail, and in particular notice that evidence of indigency is relevant to the setting of secured cash bail conditions;

ii.   A meaningful, individualized inquiry into ability to pay;

iii.   If the court is considering setting unaffordable bail as the result of evidence that the arrestee presents an unmanageable flight risk or an identifiable and articulable danger to the community, the arrestee must have notice of the evidence in question and an opportunity to testify, present his own evidence, and rebut the evidence against him;

iv.   Reasoned findings, on the record, of the arrestee's ability to pay; and

v.   If unaffordable secured cash bail is to be imposed, reasoned findings must be made on the record, by clear and convincing evidence, that detention is necessary because there is no other less restrictive means (or

combination of means) of mitigating the arrestee's unmanageable risk of flight or an identifiable and articulable danger to an individual or the community.

d.    A permanent injunction prohibiting Defendant Wayne County, as well as its employees and agents, including Sheriff Washington, from taking custody over and/or continuing to detain any indigent arrestee after arraignment unless there has been a constitutionally adequate inquiry, as described above, into the arrestee's ability to satisfy any secured cash bail conditions;

e.    An award judgment against Defendants Wayne County and Harper Woods for compensatory damages, all damages recoverable under the U.S. Constitution and/or 42 U.S.C. § 1983, and punitive damages;

f.    An order granting reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

g.    Any other relief this Court deems proper and just.

Respectfully submitted,

AKEEL & VALENTINE, PLC

*/s/Shereef H. Akeel*
Shereef H. Akeel (P54345)
Hasan Kaakarli (P81099)
Daniel W. Cermak (P84460)
Hayden Pendergrass (P86888)
Attorneys for Plaintiff
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
daniel@akeelvalentine.com
hayden@akeelvalentine.com

DATED: April 29, 2024

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES CARLOCK,                                      CLASS ACTION

      On behalf of himself and all others
similarly situated,

             Plaintiff,

                                  Case No. 24-11122

v.

CITY OF HARPER WOODS; GLEN HEANEY,
MATTHEW CLOSURDO, DANIEL MCCAW,
GEORGE SPARKS, JAMES RUTHENBERG,
and TED STAGER, in their individual capacities
as officers of the Harper Woods Police Department;
WAYNE COUNTY; 32A DISTRICT COURT,

             Defendants.

_____

SHEREEF H. AKEEL (P54345)
HASAN KAAKARLI (P81099)
DANIEL W. CERMAK (P84460)
HAYDEN PENDERGRASS (P86888)
Akeel & Valentine, PLC
Attorneys for Plaintiff
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
daniel@akeelvalentine.com
hayden@akeelvalentine.com

_____

**JURY DEMAND**

_____

71

NOW COMES Plaintiff, JAMES CARLOCK, by and through his undersigned counsel, Akeel & Valentine, PLC, and hereby demands a Trial by Jury of the above-referenced cause of action.

Respectfully submitted,

AKEEL & VALENTINE, PLC

*/s/Shereef H. Akeel*
Shereef H. Akeel (P54345)
Hasan Kaakarli (P81099)
Daniel W. Cermak (P84460)
Hayden Pendergrass (P86888)
Attorneys for Plaintiff
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
daniel@akeelvalentine.com
hayden@akeelvalentine.com

DATED: April 29, 2024